IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

CHEYENNE CTY. BD. OF EQUAL. V. MIETUS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CHEYENNE COUNTY BOARD OF EQUALIZATION, APPELLANT,

V.

JANEK AND TERESA MIETUS, APPELLEES.

Filed April 23, 2024.    No. A-23-661.

Appeal from the Tax Equalization and Review Commission. Affirmed.

Paul B. Schaub, Cheyenne County Attorney, for appellant.

Thomas Joseph Helget and Robert J. Drust III, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., for appellees.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Nebraska's Tax Equalization and Review Commission (TERC) reversed the decision of the Cheyenne County Board of Equalization (the Board), which had accepted the Cheyenne County Assessor's (Assessor) recommended valuation for a hotel property owned by Janek and Teresa Mietus. TERC found that there was competent evidence to rebut the presumption that the Board had faithfully performed its duties and that there was clear and convincing evidence that the Board's valuation decision was arbitrary and capricious. TERC vacated the Board's valuation decision and adopted the proposed valuation of the Mietuses' appraiser. The Board appeals, arguing that TERC's valuation decision does not conform to the law and is unreasonable. Finding no errors appearing on the record, we affirm TERC's decision.

## II. BACKGROUND

The Mietuses own a 30,100 square foot commercial parcel of land improved with a 16,206 square foot, 47-room hotel located in Sidney, Cheyenne County, Nebraska. The Assessor valued the property at $1,575,856 for the 2019 tax year. The Mietuses protested to the Board, but the Board agreed with the Assessor's valuation.

The Mietuses appealed the Board's decision to TERC, alleging that the "assessed value by the . . . Assessor does not reflect [the] fair market value of the property" and the "assessment fails to take into account the decline in revenue for the relevant market which significantly decreases the value of the property."

### 1. TERC HEARING

TERC held a de novo hearing on September 21, 2021. Janek Mietus testified, as did an appraiser for the Mietuses and an appraiser for the Board. Numerous exhibits were received into evidence.

TERC noted that it could take judicial notice of the entirety of the "2019 Reports and Opinions for Cheyenne County," "which would have been provided by the property tax administrator to [TERC] for purposes of what is called statewide equalization." Because exhibit 25 contained only parts of that "record," the Mietuses objected, and the exhibit was not received. The Mietuses asked TERC to take judicial notice of the "complete record." TERC stated it could and likely would "look at that complete record of the reports and opinions because it's applicable to the property in question" and notice was taken.

### (a) Janek's Testimony

Janek testified that he and his wife own the subject property. They built the hotel in 1999 and have operated it ever since. When Janek and his wife built the hotel, "everybody was going hunting, they stop in Sidney like it was a mecca," "[t]hey had to stop at Cabela's and go shopping." Vendors that wanted to sell to Cabela's would also "stop[] for two or three days." The Mietuses would "get the overflow from Cabela's travel" because the Cabela's-owned hotels "never had enough rooms for everybody"; "we were doing great for awhile [sic]." However, "Cabela's opened up a store everywhere, in Denver and every place else . . . and most people don't even stop in Sidney anymore."

Janek said the Cabela's store is still operating in Sidney, "but that's 30 people, and that's local people." The corporate offices are no longer there, no vendors are coming, there is no distribution center, and no truckers, "it's all gone." According to Janek, Sidney has "way too many hotels for what it is." There are "no other companies coming in" to "fill[] the hole." "The only thing we can hope" for is "who pulls off the highway at this point." "As of right now, we're struggling."

Janek stated, "[W]e were running consistent around 800, over $900,000 a year gross income," but "[i]n the last four years, we were hovering a little bit under 400." Their hotel "basically dropped about 50 percent occupancy" in 2017 and 2018 with the loss of Cabela's corporate office from the area. However, there are a number of fixed costs related to running the hotel, including maintaining the franchise flag, even if the occupancy rate is lower.

Janek also stated that the Mietuses' hotel has "very small rooms" with full-size beds (no queen- or king-size beds), and half of the rooms only have one bed. And there is no pool. For those reasons, the Mietuses cannot "change flags" and "have to pretty much stay with [their current hotel chain franchise] because [it has] lower requirements." However, the Mietuses' hotel "is not the most desirable flag" and does not "get the overflow" like it used to. They now have to "compete for every room" and advertise, something they did not have to do before the loss of Cabela's; their "expenses [went] way up, and the income went way down."

(b) Mietuses' Expert Testimony

Gary Brandt is a certified general real estate appraiser in Nebraska and Wyoming and holds an MAI designation from the Appraisal Institute. Brandt has been doing appraisals for more than 40 years. He has done "[f]our or 5,000 appraisals" and "about 20 percent" of his work has been in Cheyenne County. He has appraised "150 to 200" hotels and motels. Additionally, Brandt is a licensed real estate broker and has sold 8 to 10 motels.

Brandt was hired by the Mietuses to perform an appraisal of the property at issue. He inspected the property in January 2020 and did a retrospective appraisal with an effective date of January 1, 2019. He confirmed that his appraisal report, received into evidence as exhibit 24, conformed to the Uniform Standards of Professional Appraisal Practice (USPAP).

Brandt classified the Mietuses' property as a "limited-service motel/hotel." Brandt explained that there are two levels of hotels. "Full service" hotels have a restaurant and a lounge, whereas a "limited service" hotel "has no other amenities except for maybe a pool and a breakfast in the morning." Brandt said that the rooms in the Mietuses' hotel are designed smaller than typical; "[i]t's just meant for staying one night and getting up and going to your destination the next day."

Brandt was provided 3 years' worth of the subject property's income and expense history which is "important in doing an income-producing property such as a hotel or motel." He next located comparable land and improved sales and went through "the normal appraisal process" using the three approaches to value: the cost, sales-comparison, and income approaches. However, Brandt gave primary emphasis to the income approach because the subject property was designed to be income-producing. He also said that "the income approach is the primary approach to a hospitality property."

In the cost approach, Brandt reviewed three land sales in Sidney, made adjustments for elements of comparison, and was then able to determine a site/land value for the subject property. Brandt used a "Marshal-Swift Cost Manual," "a nationally-recognized cost manual that assessors use, the insurance company uses, and other various government agencies use to formulate the cost of different properties nationwide." He said he "found the costs for the type of property [he] was appraising," "used factors and also dated it back to January 1, 2019, date of value, retrospective date of value," and "[t]hen . . . estimated what the physical depreciation was based upon [his] inspection." He then considered the furniture, fixtures, and equipment contribution based on other similar properties that sold; paving and landscaping; and "external obsolescence." His report states that external obsolescence "is the impairment of desirability or useful life arising from factors that are external to the property, such as economic forces, or environmental changes, which affect

supply/demand relationships in the market." After adding the land value back in, Brandt was able to determine the value of the Mietuses' hotel as indicated by the cost approach.

For the sales-comparison approach, Brandt reviewed other limited-service properties of similar size. He looked at three sales in Sidney, "[b]ut there's such a large difference in quality, I did not consider those comparable properties." He then looked at four other hotel properties in Nebraska, one in South Dakota, and one in Wyoming that were somewhat similar to the Mietuses' property, "except for income streams." Brandt made "RevPAR" adjustments. According to Brandt's report, the "RevPAR adjustments are based on the Hotel/Motel Valuation published by the Appraisal Institute," and "the Appraisal Institute's definition of RevPAR is 'Revenue per available room is[] a monetary unit of comparison equal to available room nights multiplied by occupancy multiplied by the average daily room rate.'" Brandt testified that "RevPAR takes into consideration all elements of comparison such as age, condition, and everything, because . . . everything is based upon how the income is generated for the subject and how the income is generated for the sale," "[s]o you're comparing apples to apples that way, so to speak." In response to questions by one of the TERC commissioners, Brandt stated that he was able to get income data for the comparable sales "[e]ither from the broker, the appraiser that was involved, or from the buyer or seller."

For the income approach, Brandt reviewed the Mietuses' previous 3 years' worth of hotel income and expenses which "show[ed] a declining income stream" from 2016 to 2019. He also looked at other similar hotels or motels using a market expense ratio.

Brandt noted that "[a]t one time, [Sidney] was a destination place" because of Cabela's, and "based upon [other] rooms being built in Sidney, the [Mietuses' property] had a declining income stream for 2016 through 2019." The property's income stream "was additionally impacted by the purchase of Cabela's by Bass Pro." When asked if that impacted both the income and the possibility of comparable sales, Brandt responded, "Yes, it did."

After explaining how he determined the subject property's value under each of the three valuation approaches, Brandt said he "reconciled the three approaches" and determined that the 2019 property value was $660,000.

Brandt acknowledged that his property valuation was significantly less than the Assessor's value of $1,575,856. He said, "Based on the income that [the property] was producing, it would not support" the assessed value. When asked if the reduction of income was attributable to the change of market conditions, Brandt responded, "That's correct."

(c) The Board's Expert

Bryan Hill is a certified residential appraiser, and he also has a certified assessor's certificate. He testified that he has experience assessing commercial properties. Hill previously worked in the Keith County Assessor's Office from 2000 to 2011, during which time he became the chief appraiser and "was in charge of or responsible for all of [the] Keith County assessments." He was later retained by the Nebraska Department of Revenue, which had the ability to help assessors that did not have the resources to appraise larger projects; Hill helped appraise an ethanol plant, including a new fuel station. Hill "just recently started a business as an assessment specialist" and helps counties with their assessments. On cross-examination, Hill testified that with his credentials, he was "only supposed to appraise residential properties." However, "with hearings

- 4 -

like this, you do not have to be a certified general to appraise commercial properties" because "[w]hen you are in this type of setting, you're exempt from the Nebraska Real Property Appraisal Act." See Neb. Rev. Stat. § 76-2221 (Cum. Supp. 2022) (Real Property Appraiser Act exemptions).

Hill was hired by the Board to perform an appraisal of the property at issue. He inspected the property in August 2021 and did a retrospective appraisal analysis with an effective date of January 1, 2019. His appraisal report, received into evidence as exhibit 7, states: "Even though this appraisal was developed using Uniform Standards of Professional Appraisal Practice (USPAP) the value opinion may not meet the minimum standards contained in USPAP and is not governed by the Real Property Appraiser Act." See § 76-2221. During further questioning by one of the TERC commissioners, Hill stated that the USPAP does apply to him, "other than where the jurisdictional exception rule applies"; Hill claimed a jurisdictional exception did apply in this case.

Hill viewed the subject property, which he said was a "limited service hotel." He said the Mietuses' hotel was "a sleep-and-go hotel" that "doesn't have a lot of amenities that other hotels do." Like Brandt, Hill used all three valuation approaches: the cost, sales-comparison, and income approaches. Hill relied mostly on the cost and income approaches to value.

In the cost approach, Hill reviewed five land sales along interstate interchanges in Cheyenne and Keith Counties that Hill considered comparable sales. One of the TERC commissioners noted that four of the five land sales occurred after January 1, 2019. When asked by counsel why he went outside of the timeframe, Hill said that "especially with the [land sales] in Sidney, the one that happened in February 19 of 2021, which is the most recent, will show the impact of the marketability of land in Sidney because of the sale of Cabela's to Bass Pro Shop." Additionally, the property sold in February 2021 was similar in size to the Mietuses' property. Hill used the price per acre from the February 2021 land sale to determine the land value of the Mietuses' property. Hill determined the improvement value by looking at the total "replacement cost new" from the Assessor's property record card; the Assessor's office used the "Marshall & Swift Cost Approach," and Hill wanted to maintain uniformity of the commercial properties in Sidney. Hill then took into consideration depreciation and functional and economic obsolescence. After adding the land value back in, Hill was able to determine the value of the Mietuses' hotel as indicated by the cost approach.

For the sales-comparison approach, Hill used five hotel sales along Interstate 80 in Nebraska that he felt were the most comparable to the subject property; the properties were in Cheyenne, Buffalo, Dawson, Keith, and Kimball counties. Hill said he had reviewed Brandt's appraisal and noticed that a lot of the comparable sales were not along Interstate 80, which Hill thought "was a big error when it comes to finding marketability or similar markets in the area." For the five comparable hotel sales Hill reviewed, he determined the average price per room (based on the "gross sale") and applied that rate to the 47 rooms in the Mietuses' hotel. According to his report, Hill then made a deduction for furniture, fees, and equipment.

For the income approach, Hill reviewed 16 hotels along Interstate 80 "from York west" to determine what he believed to be typical market income, expenses, occupancy, and capitalization rates. On cross-examination, Hill acknowledged that he based the market on 16 comparable hotels but did not get any physical income data for those properties. Hill stated, "[T]hrough [phone] interview[s] [usually with the owners or managers of the hotels], I had a really good idea on average daily rate and occupancy," "[a]nd the number of rooms is public information," "[s]o as

long as you have those three features, you can get a potential gross income." (On cross-examination, Hill stated that it was "very common for fee appraisers" to get data from other appraisers and brokers like Brandt did. When asked why he did not pursue those, Hill stated, "A lot of it was time constraints.") Of the 16 comparable hotels that Hill used, Hill did not know the exact number that were limited-service hotels but thought "80 percent of them were limited service." He was then asked about each of the 16 hotels, all but three of which were in a town that had not lost an employer, and many of the hotels had more rooms or amenities than the Mietuses' hotel. Of the three hotels that were in a town that lost an employer, one was a full-service hotel, and the other two were in Sidney but were better quality, had more rooms, or more amenities than the Mietuses' hotel.

Hill stated that his income valuation did take into account Cabela's departure from Sidney. He "wanted to point out" that he felt Sidney "was a very strong market." "At one time, there were many people that stayed there." "And I would say from year '16 to 2010 it was very strong," which is why hotels continued to be built. After reviewing the comparable properties, Hill now felt that Sidney's hotel market along Interstate 80 was "more typical" of other hotels along the interstate. Hill said that Sidney had "some economic issues with hospitality properties" because when Cabela's sold to Bass Pro Shop "many aspects of Cabela's" were removed from the area. But the retail store was still there, "which I feel still draws people to come and pull off the interstate for." Hill also felt that a "key part of . . . Sidney is they are the last stop before . . . the town of Cheyenne," and "[i]f anybody is going to travel and they're heading west, more than likely they're going to stop in Sidney."

After explaining how he determined the subject property's value under each of the three valuation approaches, Hill said he determined that the 2019 property value was $1,280,000.

On cross-examination, Hill acknowledged that his property valuation was not in agreement with the Assessor's value of $1,575,856.

## 2. TERC'S DECISION

TERC entered its decision and order on July 26, 2023. It stated that three opinions of value for the property were present in this case -- the Assessor's, Hill's, and Brandt's. TERC determined that, based on Brandt's experience and credentials, his opinion of actual value was more credible. TERC "vacated and reversed" the decision of the Board and ordered that the assessed value of the property for the 2019 tax year was $660,000.

The Board appeals.

## III. ASSIGNMENT OF ERROR

The Board assigns that TERC's valuation does not conform to the law and is unreasonable.

## IV. STANDARD OF REVIEW

Appellate courts review decisions rendered by TERC for errors appearing on the record. *Cain v. Custer Cty. Bd. of Equal.*, 315 Neb. 809, 1 N.W.3d 512 (2024). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor

- 6 -

unreasonable. *Id.* Competent evidence is evidence that is admissible and tends to establish a fact in issue. *Id.*

Agency action is arbitrary, capricious, and unreasonable if it is taken in disregard of the facts or circumstances of the case, without some basis which would lead a reasonable and honest person to the same conclusion. *Id.*

## V. ANALYSIS

### 1. GENERAL PRINCIPLES OF LAW

The Nebraska Supreme Court has recently stated:

> Although we have recognized that the appraisal of real estate "is not an exact science" and "is largely a matter of opinion without a precise yardstick for determination," our statutes provide a framework for assessing real property and appealing those assessments. With exceptions for agricultural and horticultural land, Neb. Rev. Stat. § 77-201(1) (Reissue 2018) states that all real property "shall be valued at its actual value." Section 77-112 defines actual value as "the market value of real property in the ordinary course of trade." Generally, a county assessor may determine actual value using (1) the sales comparison approach under Neb. Rev. Stat. § 77-1371 (Reissue 2018), (2) the income approach, (3) the cost approach, or (4) any "professionally accepted mass appraisal method[ ]."

*Lincoln Cty. Bd. of Equal. v. Western Tabor Ranch Apts.*, 314 Neb. 582, 588-89, 991 N.W.2d 889, 895-96 (2023) (brackets in original).

Property owners may protest a county assessor's determination of actual value under these methods to the county board of equalization. *Id.* The county board of equalization's decision may then be appealed to TERC. *Id.* On appeal, there is a presumption in favor of the county board of equalization. *Id.* Neb. Rev. Stat. § 77-5016(9) (Reissue 2018), states:

> In all appeals, excepting those arising [from a county tax levy], if the appellant presents no evidence to show that the order, decision, determination, or action appealed from is incorrect, [TERC] shall deny the appeal. If the appellant presents any evidence to show that the order, decision, determination, or action appealed from is incorrect, such order, decision, determination, or action shall be affirmed unless evidence is adduced establishing that the order, decision, determination, or action was unreasonable or arbitrary.

The Nebraska Supreme Court has construed that the language of § 77-5016(9) creates a presumption in an appeal to TERC that a county board has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. *Cain v. Custer Cty. Bd. of Equal., supra.* The presumption disappears when there is competent evidence adduced on appeal to the contrary. *Lincoln Cty. Bd. of Equal. v. Western Tabor Ranch Apts., supra.* Competent evidence is evidence that is admissible and tends to establish a fact in issue. *Cain v. Custer Cty. Bd. of Equal., supra.* If the challenging party overcomes the presumption of validity by competent evidence, the reasonableness of the valuation fixed by the county board becomes a question of fact based on all the evidence presented. *Id.*

Once competent evidence is adduced to show that the order, decision, determination, or action appealed from is incorrect, the property owner retains the burden to show by clear and convincing evidence that the county board's decision was arbitrary or unreasonable. *Lincoln Cty. Bd. of Equal. v. Western Tabor Ranch Apts., supra.* See, also, *Cain v. Custer Cty. Bd. of Equal., supra* (on appeal from action of county board, taxpayer has burden of showing that valuation is unreasonable or arbitrary). The burden of persuasion imposed on a complaining taxpayer is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed upon the property, when compared with valuations placed on other similar property, is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment. *Id.*

## 2. NO ERRORS APPEARING ON RECORD

In this case, the Assessor valued the Mietuses' hotel property at $1,575,856 for the 2019 tax year. The Mietuses protested to the Board, but the Board agreed with the Assessor's valuation. The Mietuses then appealed to TERC. At the TERC hearing, testimony and appraisal reports were received from the experts for both the Mietuses and the Board--both experts determined that the value of the Mietuses' hotel property was less than the value determined by the Assessor. The testimony and appraisal reports of both experts were admissible and tended to establish a fact in issue, i.e., the actual value of the hotel property, and therefore constituted "competent evidence." See *Cain v. Custer Cty. Bd. of Equal., supra.* TERC found that the Hill and Brandt appraisals rebutted the presumption that the Board faithfully performed its duties and had sufficient competent evidence to make its determination. We find no errors appearing in the record regarding that finding by TERC.

Having rebutted the presumption that the Board's decision was correct, the Mietuses had to clearly and convincingly show that the Board's decision was arbitrary or unreasonable. *Lincoln Cty. Bd. of Equal. v. Western Tabor Ranch Apts., supra.* That presented a question of fact to be determined based on all the evidence presented. See *Cain v. Custer Cty. Bd. of Equal., supra.* See, also, *Cabela's, Inc. v. Cheyenne Cty. Bd. of Equal.*, 8 Neb. App. 582, 597 N.W.2d 623 (1999) (weight given to expert testimony, and credibility of witnesses, is fact question decided by fact finder at trial). TERC found that, based on Brandt's experience and credentials, his appraisal of $660,000 was more credible than Hill's appraisal of $1,280,000. TERC also found that Brandt's appraisal was clear and convincing evidence that the Board's decision was arbitrary or unreasonable. TERC "vacated and reversed" the decision of the Board and ordered that the assessed value of the property for the 2019 tax year was $660,000.

The Board argues that "TERC adopted, in entirety, the value proposed by [Brandt], despite numerous deficiencies in his report," and "[Hill's] recommendation went unnoticed." Brief for appellant at 8-9. The Board claims that "[t]his 'winner-take-all' review of appraiser recommendations resulted in a valuation which is not actual value," and in "un-equalization" where "others in the same taxing district will be paying a disproportionate share of real estate tax." *Id.* at 9.

We find no error regarding TERC's finding that Brandt's appraisal was more credible. Brandt was a general certified appraiser who had appraised between 150 and 200 hotels, whereas Hill was only a certified residential appraiser; additionally, Hill did not testify to having experience

- 8 -

appraising hotels. Both appraisers utilized the same three approaches to valuation, with an emphasis on the income approach. As noted by TERC:

> Brandt used data compiled from sales reports in his sales comparison approach, as well as the actual income and expenses from the Subject Property and comparable properties to calculate a typical market average. The properties selected by Brandt for comparison were all limited service hotels with average or average/good quality and condition ratings, were of similar size, and had similar amenities. Brandt also provided adjustment to the price-per-room to improve comparability. The properties selected by Hill generally had greater amenities, such as swimming pools, fitness centers, or conference rooms. However, it is unclear from the record as to what, if any, adjustments were made to account for and improve comparability. Additionally, one sale listed . . . was sold after the assessment date of January 1, 2019. Additionally, the PRF indicates that [sale] would be considered superior in terms of amenities or location.

TERC's comparison of the two appraisals is supported by the record.

In its brief on appeal, the Board notes alleged shortcomings in Brandt's appraisal while emphasizing certain portions of Hill's appraisal that were favorable to a higher valuation. But the weight to be given to expert testimony, and the credibility of witnesses, is a fact question to be decided by the fact finder at trial. See *Cabela's, Inc. v. Cheyenne Cty. Bd. of Equal., supra*.

The Board "maintains that, considering all the evidence, TERC's decision does not reflect actual value and it is unreasonable." Brief for appellant at 13. The Board states that "a $620,000 difference [between Brandt's and Hill's valuations] suggests either a complete failure on the part of [Hill, the Board's appraiser], or TERC rushed to a decision." *Id.* at 12-13. The Board appears to suggest that TERC should have performed an "independent valuation, where, for example, proposed comparable properties were selected from each appraiser report to arrive at land and building values." *Id.* at 9. However, the Board cites us to no authority requiring TERC to engage in such independent review, rather than accepting the valuation of the appraisal expert it deemed more credible.

Because the Board contends that TERC's $660,000 valuation does not reflect actual value, the Board claims that TERC's valuation results in "un-equalization." Brief for appellant at 13. See, *Scribante v. Douglas Cty. Bd. of Equal.*, 8 Neb. App. 25, 588 N.W.2d 190 (1999) (equalization is process of ensuring all taxable property placed on assessment rolls at uniform percentage of actual value); *Cabela's, Inc. v. Cheyenne Cty. Bd. of Equal., supra* (purpose of equalization of assessments is to bring assessments from different parts of taxing district to same relative standard so no one part compelled to pay disproportionate share of tax). In support of its argument, the Board notes that the "[p]rice per room per TERC's value is $660,000/47 rooms = $14,043/room." Brief for appellant at 13. It claims "[t]hat price is grossly underpriced when compared to nearby comparable properties, which range from [$]20,882/room to $35,106/room," with a "mean price per room" of $29,099. *Id.* However, the "comparable properties" used by the Board come from Hill's appraisal report, which TERC deemed less credible than Brandt's. TERC noted that the properties selected by Hill generally had greater amenities and "it is unclear from the record as to what, if any, adjustments were made to account for and improve comparability"; additionally, one

of the sales listed was sold after the January 1, 2019, assessment date and "would be considered superior in terms of amenities and locations."

On the other hand, TERC noted that "Brandt used data compiled from sales reports in his sales comparison approach, as well as the actual income and expenses from the Subject Property and comparable properties to calculate a typical market average." The properties selected by Brandt "were all limited service hotels with average or average/good quality and conditions ratings, were of similar size, and had similar amenities," and Brandt "also provided adjustment to the price-per-room to improve comparability." TERC found that Brandt's $660,000 appraisal was clear and convincing evidence that the Board's decision ($1,575,856 value) was arbitrary or unreasonable.

To make an "arbitrary and unreasonable" finding, TERC implicitly found that the Mietuses established by clear and convincing evidence that the valuation placed upon their property, when compared with valuations placed on other similar property, is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment. See *Cain v. Custer Cty. Bd. of Equal.*, 315 Neb. 809, 1 N.W.3d 512 (2024). We find no error in that regard.

## VI. CONCLUSION

For the reasons stated above, we find no errors appearing on the record and we affirm TERC's decision to vacate and reverse the decision of the Board and order that the assessed value of the Mietuses' hotel property for the 2019 tax year was $660,000.

AFFIRMED.